UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MARK WEINERT,

                Plaintiff,

      v.                                                              Case No. 18-cv-1995-bhl

DR. CHARLES LARSON, et al.,

                Defendants.

---

## DECISION AND ORDER

---

In this lawsuit, plaintiff Mark Weinert alleges that Dr. Charles Larson and Health Service Unit Manager Candace Whitman were deliberately indifferent towards his serious medical condition and committed medical malpractice under Wisconsin state law. Dkt. Nos. 1, 5, 21, 31. On May 28, 2020, defendants moved for summary judgment. Dkt. No. 44. That motion is now fully briefed. On July 1, 2020, Weinert filed a motion to appoint counsel for trial. Dkt. No. 49. For the reasons explained in this order, the Court will grant in part and deny in part the defendants' motion for summary judgement and grant Weinert's motion to appoint counsel for trial.

## FACTUAL BACKGROUND

In March 2018, Weinert injured his arm while working at Fox Lake Correctional Institution. Whitman Dec., Dkt. No. 47, ¶19. The defendants and other prison officials responded promptly. Nursing staff saw Weinert on multiple occasions. *Id*., ¶19-21, 27. Dr. Larson, an advanced care provider, also saw Weinert. Dr. Larson ordered both an x-ray and an MRI, and referred Weinert to an offsite orthopedist, Dr. Eric Nelson, who is not a defendant. Larson Dec., Dkt. No. 48, ¶¶11-12. Weinert received x-rays on his arm on March 30, 2018 and May 17, 2018, and Dr. Nelson diagnosed his injury as a chronic Distal Biceps Rupture. Dkt. No. 47, ¶¶25, 34,

36.  Dr. Nelson offered surgery to repair the injury, but the surgery required that Weinert first submit to an MRI.  *Id*., ¶37.

Obtaining the MRI proved challenging when Weinert reported that he was claustrophobic.  Dkt. No. 47, ¶28.  In response, Dr. Larson ordered that Weinert be provided 5mg of Diazepam to help ease Weinert's anxiety associated with the MRI.  Dkt. No. 48, ¶14.  According to Dr. Larson, Diazepam is a short-acting benzodiazepine that helps a patient remain calm during an MRI, and the 5mg dose prescribed was the customary dosage for an average-sized adult like Weinert.  *Id*.

On May 10, 2018, Weinert was transported to Waupun Memorial Hospital for the MRI.  Despite Dr. Larson's order, Weinert did not receive the medication before leaving for the hospital.  Dkt. No. 47, ¶30.  The reasons for this failure are unclear.  Dr. Larson explains that, "for reasons not totally apparent to us in the HSU, security did not stop at the HSU so that Weinert could receive his medication before leaving the institution for his scheduled MRI." Dkt. No. 48, ¶15.  Whitman explains that she does not have any control over or supervise security staff.  Dkt. No. 47, ¶31.  Regardless of the reason, it is undisputed that Weinert did not receive his medication on May 10 and, given his claustrophobia, could not complete his scheduled MRI.

After the first failed MRI attempt, Dr. Larson ordered a second attempt, which was to take place on May 17, 2018.  *See* Dkt. No. 47, ¶¶34-35.  Prior to that appointment, Weinert reiterated his concerns about his claustrophobia in a health services request document:

> "Somehow I didn't get a pill for MRI on 5-11. It had to be rescheduled. I had to have two shots of Adavan on a MRI in CVCTF. I'm afraid one pill won't work. Will you make provisions like extra pills or something? Extremely claustrophobic."

*Id*., ¶33.  HSU replied, "already addressed on 5/17/18 @ offsite."  *Id*.  Again, despite the standing order for 5mg Diazepam, Weinert did not receive the medication before leaving for the hospital on May 17.  *Id*., ¶38.  And, again, he could not complete the MRI.  *Id*.

2

Dr. Larson then ordered a third attempt at the MRI. Dkt. No. 47, ¶40. Prior to that MRI attempt, Weinert submitted two different HSU requests stating that he needed "sufficient medication" for his next attempted MRI. *Id.*, ¶41. In response, Dr. Superville (not a defendant) placed an order specifying that Weinert should take 5mg Diazepam 30 minutes before his MRI. *Id.*, ¶43. Weinert also met with a nurse to discuss the upcoming MRI. *Id.*, ¶48. Weinert told the nurse that he had previously received two 5mg doses of Lorazepam (not Diazepam) at a different institution to complete an MRI. *Id.* Lorazepam is a different anti-anxiety medication that can also be used to sedate an individual. Dkt. No. 48, ¶¶17,18. The nurse told Weinert that Diazepam was the Department of Corrections (DOC) choice medication for pre-MRI claustrophobia, but agreed to talk to an advance care provider about possible alternative doses. Dkt. No. 47, ¶48. Dr. Whitman did not believe a different dose was appropriate because 5mg of Diazepam is the customary dosage for an average-sized adult to help relieve anxiety and induce calm, however he I reconsidered that decision and later placed an order for 10mg of Diazepam in the hopes it would help Weinart complete the MRI. Dkt. No. 48, ¶16. Weinert received Diazepam prior to his June 28 MRI, but he nevertheless could not complete his third attempt at an MRI. *Id.*, ¶17.

Dr. Larson then ordered a fourth attempt at an MRI. Dkt. No. 48, ¶19. For this fourth (and ultimately final) attempt, Dr. Larson ordered 1mg of oral Lorazepam for Weinert. *Id.* Before this fourth MRI attempt, Weinert sent a three-page letter to Whitman explaining that Diazepam was ineffective for him. Dkt. No. 47, ¶53; *see also* Dkt. No. 47-1 at 39-42. He stated that he had received 10ccs of Ativan when he took an MRI while incarcerated at a different institution. *Id.* Whitman then met with Weinert on July 12, 2018 to discuss his letter. *Id.*, ¶54. According to the "progress notes" from that appointment, Weinert stated that he wanted intravenous push (IVP) Ativan for the next MRI attempt, as he had allegedly received at a different institution. *See* Dkt.

No. 47-1 at 5. Weinert allegedly said that he "pretty much needed to be knocked out" for the MRI. *Id*. Weinert denies making these statements; he states that his progress notes, Whitman's declaration, and Dr. Larson's declaration (all of which indicate that he asked for IVP Ativan) are "false." *See* Dkt. No. 51 at 3-5. Weinert states that he never "asked" for IVP Ativan; he simply explained that it was treatment that had worked for him in the past while he was incarcerated. *See* Dkt. No. 58, ¶1; *see also* Dkt. No. 55.

At the July 12, 2018 appointment, Whitman told Weinert that the DOC could only order oral medication (not IV medication). Dkt. No. 47, ¶54. Whitman nevertheless followed up on whether IVP Ativan could be possible for the MRI. *Id*. Whitman looked at Weinert's medical records and found that he submitted to an MRI in the emergency room while confined at a different institution but could not confirm that he had received IVP Ativan. *Id*. The medical program assistant at Fox Lake then sent Dr. Nelson's office an email asking whether he would be willing to prescribe an IVP Ativan given that the DOC could not prescribe it. *Id*., ¶57. Dr. Nelson responded,

> "No IV Ativan prescription from me, especially since I would not be present or otherwise involved in administering or monitoring the effect of such a prescription—the suggestion is not acceptable by any professional standards."

*Id*., ¶58.

Dr. Larson explains that any benzodiazepine medication administered via IV (as opposed to orally) is best administered in a setting where the patient can be monitored under sedation protocols. Dkt. No. 48, ¶18. Complications from an IV medication can lead to respiratory depression or arrest, which is why it is reserved for outpatient hospital use. *Id*. A prison HSU does not have the equipment or resources available in an outpatient hospital, so the DOC can only order oral medication. *Id*. Dr. Larson then changed the prescription from 10mg Diazepam to 1mg

4

Lorazepam. *Id.*, ¶19. Lorazepam is the generic version of Ativan and that 1mg is the appropriate equivalent dosage. *Id.*, ¶17; Dkt. No. 48, ¶61.

Dr. Larson and Whitman then met with Weinert on July 19, 2018 to talk about his upcoming MRI. Dkt. No. 47, ¶59. They told him that this would be the final intervention and no other sedatives would be provided if he was still unable to submit to an MRI. *Id.* They also explained that Dr. Nelson would not order IVP Ativan. *Id.* Weinert received 1mg Lorazepam before leaving the institution on July 25, but he still could not complete his fourth MRI. *Id.*, ¶60.

A few days after his fourth MRI attempt, on July 29, 2018, Weinert submitted an HSU request complaining about the timing of when he received the Lorazepam. Dkt. No. 47, ¶61. He stated that he received the medication at 6:30 a.m. for an 11:30 a.m. MRI. *Id.* Whitman responded that the half-life of Lorazepam is 12-14 hours, so a five-hour period after receiving the drug was adequate. *Id.* Dr. Larson explains that Lorazepam remains effective for 12 or more hours after oral ingestion. Dkt. No. 48, ¶21. Thus, receiving the medication before leaving the institution would have allowed him to benefit from the medication well within his MRI timeframe. *Id.*

On August 1, 2018, Dr. Sally Williams, the Psychologist Services Director at Fox Lake, emailed Whitman suggesting a meeting with Weinert and the two of them in preparation for his next MRI. Dkt. No. 47, ¶62. Whitman responded that another MRI would not be scheduled because neither Dr. Larson nor Dr. Nelson would order the medication that Weinert claimed he needed to complete the MRI. *Id.* A few days later, on August 3, 2018, Weinert submitted an HSU request inquiring about next steps to treat his injury. *Id.*, ¶63. Whitman responded that she would talk to Dr. Larson upon his return to the institution in a few weeks, but that Dr. Nelson would not take further action without an MRI image. *Id.* The medical program assistant at Fox Lake again reached out to Dr. Nelson's office. *Id.*, ¶64. According to her notes,

5

> "Dr. Nelson said he already addressed this issue. He will not operate without an imaging. He [Weinert] is welcome to a second opinion but he [Dr. Nelson] cannot imagine anyone would operate without the proper imaging."

*Id*.

On August 15, 2018, Whitman sent Weinert a memo explaining that nothing further could be done to treat his injury. Dkt. No. 47, ¶65. The memo noted that a bicep tendon repair was an elective procedure and no further services were necessary or required in order for Weinert to "function adequately in daily living." *Id*. Weinert disputes this statement and explains that his daily activities and work capabilities have been drastically reduced — he has been in constant pain for the past 27 months and has very limited mobility in his arm. Dkt. No. 53 at 16; *see also* Dkt. No. 1 at 25. Weinert states that his mobility is so limited that he likely will not be able to return to his job as a roofer when he is released from prison. Dkt. No. 1 at 25.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party asserting that a fact is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

6

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

To establish an Eighth Amendment violation, Weinert must prove that the defendants acted with deliberate indifference toward an excessive risk to his health or safety. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Weinert must provide evidence from which a reasonable jury could conclude that: (1) he faced an objectively serious risk of harm and (2) the defendants subjectively knew about the risk of harm and disregarded it. *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (citing *Arnett v. Webster*, 658 F.3d 742, 750, 751 (7th Cir. 2011)).

The first, objective, element is satisfied by showing that Weinert suffered from a condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citing *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008)). The second, subjective, element is satisfied by showing that a prison official "knows of a substantial risk of harm to an inmate and 'either acts or fails to act in disregard of that risk.'" *Gomez*, 680 F.3d at 865 (quoting *Arnett*, 658 F.3d at 750). This is a "high hurdle." *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012). It requires "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Id*. (quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)). Weinert must show that the defendants' decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)).

For purposes of summary judgment, the defendants do not dispute that Weinert's injury qualifies as an objectively serious medical condition. Dkt. No. 45 at 14. Instead, they assert that they are entitled to summary judgment because the record shows they responded appropriately to his medical needs. *Id.* at 15-19.

### A. The Record Shows that Dr. Larson and Whitman Responded Appropriately to Weinert's Medical Needs with Respect to Facilitating His Four MRI Attempts and Possible Surgery.

The defendants insist they are entitled to summary judgment because the record shows they acted reasonably in facilitating his various MRI attempts and possible surgery. With respect to Dr. Larson, the defendants point to Weinert's medical records which show that Dr. Larson examined Weinert, ordered four different MRIs, affirmatively prescribed oral anti-anxiety medication before each MRI (Diazepam and Lorazepam), increased the dosage of Diazepam when the prior dose was ineffective, contacted Dr. Nelson's office to see if he would be willing to prescribe IVP Ativan (which Weinert had reported was effective in the past), then changed the prescription from Diazepam to an equivalent amount of Lorazepam (the generic version of Ativan). Dr. Larson also submitted a declaration explaining that he used his medical judgment to determine the appropriate dose of Diazepam and Lorazepam for his third and fourth unsuccessful MRIs.

With respect to Whitman, the defendants emphasize that neither she nor Dr. Larson were responsible for supervising prison security staff, who appear to have failed to provide Weinert with Diazepam prior to the first two unsuccessful MRIs attempts. They also state that there is no evidence to support Weinert's accusation that Whitman "sabotaged" efforts to treat Weinert's arm injury.

8

Case 2:18-cv-01995-BHL   Filed 02/02/21   Page 8 of 14   Document 60

In response, Weinert makes 17 interrelated arguments (through numerous disorganized documents on the record), which attempt to paint his own failure to sit for the MRI as deliberate indifference by Dr. Larson and Whitman. *See* Dkt. Nos. 50-56, 58. These arguments fail for a variety of reasons.

First, Weinert tries to downplay the defendants' repeated efforts to complete an MRI by identifying minor issues with each MRI, most of which were not attributable to the defendants. Dkt. No. 50 at 5. For example, Weinert notes that he did not actually *receive* Diazepam before his May 10 and May 17 MRIs. *Id.* But there is no evidence in the record showing that either Dr. Larson or Whitman was involved in Weinert's failure to receive the medication (which Dr. Larson prescribed in the first place.) Indeed, Whitman explains that HSU staff is responsible for ordering medication (which Dr. Larson did) and prison security staff is responsible for bringing inmates to HSU to receive the medication. Whitman states that neither she nor Dr. Larson supervise security staff. And there is no other evidence on the record showing that Whitman or Dr. Larson had any role in security staff's failures to do their jobs.

Weinert points to a prison policy document, DAI § 500.10.18, which directs HSU staff to "collaborate" with security staff in connection with offsite appointments, including on medications. *Id.* at 15-16; Dkt. No. 50-1 at 64. Weinert purports to testify that neither Dr. Larson nor Whitman "told" security staff that he needed medication before his first two MRI attempts. Dkt. No. 51 at 1. But nothing in the general prison policy or in Weinert's speculative declaration creates an issue of material fact. Weinert's attempt to testify to the defendants' inaction regarding his medication is not based on his personal knowledge, i.e., something he personally saw, heard, or experienced. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence,

9

and show that the affiant or declarant is competent to testify on the matters stated.")  Further, even assuming that Whitman and Dr. Larson should have taken a personal interest in ensuring that security staff brought Weinert to HSU prior to the first two MRIs (which they were under no obligation to do), their failure to check in with security staff amounts to negligence at best, not deliberate indifference. *See McCann v. Ogle Cnty.,* 909 F.3d 881, 886-87 (7th Cir. 2018) ("A showing of negligence or even gross negligence will not suffice" to establish deliberate indifference.).

Next, Weinert suspects that Dr. Larson failed to prescribe Diazepam for his second MRI attempt on May 17. Dkt. No. 50 at 7-8.  He points to the "prescriber's order" portion of his medical records, *see* Dkt. No. 50-1 at 38-39 and Dkt. No. 56-1, and proclaims that someone in HSU was required to "re-order" the Diazepam and that Dr. Larson's failure to do so, amounts to deliberate indifference.  The defendants disagree factually, contending that the prescription from the May 10 attempt carried over to the May 17 attempt.  To the extent the record is disputed on this issue, it does not help Weinert.  Again, even assuming Dr. Larson should have re-submitted the prescription request, his failure to do so would be negligence at best, not deliberate indifference.  Given Dr. Larson's subsequent efforts to obtain sedation for Weinert on his subsequent MRI attempts, no reasonable jury could conclude that Dr. Larson's conduct with respect to the second MRI attempt was deliberate indifference.

Weinert admits he does not blame Dr. Larson for the failure of the third MRI attempt on June 28. Dkt. No. 50 at 6.  But he insists that Dr. Larson's failure to "write a specific time" to take the Lorazepam before the fourth MRI attempt amounts to deliberate indifference. Dkt. No. 50 at 9-10.  Weinert also complains that he was given the Lorazepam too far in advance of the scheduled MRI.  *Id.* at 5, 7, 9.  These complaints likewise do not defeat summary judgment.

10

Dr. Larson's declaration explains the medical judgments behind these facts. He prescribed 5mg Diazepam for the third MRI because that is the customary initial dose for an average-sized adult such as Weinert. When Weinert was unable to submit to an MRI with this initial dose, Dr. Larson increased it to 10mg Diazepam, the next appropriate dose. Dr. Larson then changed that prescription to 1mg Lorazepam based on Weinert's statement that Ativan (a brand name version of Lorazepam) had been effective in the past. Dr. Larson explains that the half-life of Lorazepam is 12-14 hours, so receiving the medication before leaving the institution would have allowed Weinert to benefit from the medication well within the MRI timeframe. Dr. Larson's undisputed declaration establishes that he used his medical judgment in prescribing sedation. Weinert's complaints regarding the timing and amount of prescribed medication is mere disagreement with Dr. Larson's medical judgment. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (concluding that mere disagreement with medical judgment does not amount to deliberate indifference). Toward that end, Weinert is not a medical expert and is not competent to challenge those judgments. *See Holloway v. Delaware Cty. Sheriff,* 700 F.3d 1063, 1073 (7th Cir. 2012).

Finally, Weinert tries to recharacterize his discussions with the defendants on the use of IV Ativan for his MRIs, contending he never "asked" for sedative medication by IV. Dkt. No. 50 at 1. He accuses Whitman of "sabotaging" his efforts to get surgery by providing "false" information to Dr. Nelson when she instructed a medical assistant to inquire about the possibility of Dr. Nelson prescribing IV sedation. *Id.* at 13. These assertions do not create an issue of material fact. The contemporaneous medical records show that Weinert discussed IV sedation, and, no matter how these discussions are characterized, they have no bearing on whether defendants acted with deliberate indifference in facilitating his various MRI attempts. The defendants explored the possibility of IV sedation having listened to Weinert's discussion of his prior treatments. There is

11

no evidentiary or logical support for Weinert's claim that Whitman's attempt to obtain IV sedation for him "sabotaged" his treatment.

Weinert has not come forward with evidence sufficient to overcome the high hurdle needed to support a finding that defendants were deliberately indifferent with respect to facilitating his four MRI attempts and possible surgery. The Court will therefore grant summary judgment in favor of Dr. Larson and Whitman regarding this claim and will dismiss Whitman from this lawsuit.

### B. A Reasonable Jury Could Conclude that Dr. Larson Was Deliberately Indifferent in Refusing Further Treatment After the Unsuccessful MRI Attempts.

Weinert asserts that Dr. Larson did not use his medical judgment at all when he suddenly concluded that no further treatment was necessary after Weinert's fourth unsuccessful MRI. Unlike Weinert's other allegations, this argument cannot be refuted on summary judgment.

Dr. Larson offers little explanation for completely stopping treatment of Weinert's injury (which he concedes in this motion was a serious medical condition). There is no evidence showing that Weinert's injury had improved or healed by that time; that the range of motion in his arm had improved or returned to normal; that he no longer appeared to be in pain; or that his pain had improved.

While Weinert must cooperate in this treatment, and the record could support a finding that he unreasonably refused to allow the MRI to be completed, the Court cannot conclude that defendants had no other options or that Weinert had precluded all treatment. In the absence of an explanation as to why no other treatment was medically necessary or tenable following the fourth unsuccessful MRI attempt, a reasonable jury could conclude that Dr. Larson's decision to cease all treatment was based on frustration and/or annoyance with Weinert's inability to submit to an MRI rather than his actual medical judgment. Summary judgment must, therefore, be denied.

12

Dr. Larson also does not explain why he is entitled to summary judgment on the state law medical malpractice claim. *See* Dkt. No. 45.  Thus, that claim survives summary judgment as well.

### C. Dr. Larson Is Not Entitled to Qualified Immunity.

Qualified immunity protects government officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (internal citations omitted).  The Court evaluates: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated the plaintiff's constitutional rights and (2) whether that constitutional right was "clearly established" at the time of the alleged violation. *Id*.  The latter inquiry is often dispositive and may be addressed first. *Id*.

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  The unlawfulness of a particular official's action must be apparent "in light of the pre-existing law." *Id.*  A party may demonstrate that a right was clearly established by presenting a closely analogous case establishing the defendant's conduct was unconstitutional or by presenting evidence the defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court. *See Hope*, 536 U.S. at 739-40.

Dr. Larson asserts that Weinert has not presented any closely analogous case establishing that he has a constitutional right to the medication or treatment of his choosing.  However, the problematic conduct in this case was not Dr. Larson's refusal to prescribe IVP Ativan to complete the MRI — it was his decision to simply cease providing medical care altogether without any explanation as to why treatment was no longer medically necessary or tenable.  Surgery may have

13

been out of the question given Weinert's inability to submit to an MRI. But Weinert claimed that he still had problems with his arm such as chronic pain and limited mobility. Dr. Larson, therefore, had to explain (using his medical judgment) why those medical conditions could not, or need not, be treated. That constitutional right — the right to receive medical care based on medical judgment, as opposed to assumptions, frustration, or whim — is clearly established. *Arnett v. Webster*, 658 F.3d 742 (7th Cir. 2011); *Roe v. Elyea*, 631 F.3d 843 (7th Cir. 2011); *Diggs v. Ghosh*, 850 F.3d 905, 910 (7th Cir. 2017). Indeed, failure to explain a medical decision is the quintessential example of a doctor's failure to use medical judgment. Dr. Larson is not entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, **IT IS ORDERED** that the defendants' motion for summary judgment (Dkt. No. 44) is **GRANTED in part** and **DENIED in part**. The motion is granted with respect to Whitman, and Whitman is **DISMISSED** from this case. The motion is also granted with respect to Dr. Larson's conduct related to the MRI attempts and possible surgery. The motion is denied with respect to Dr. Larson's conduct following the MRI attempts and the state law medical malpractice claim. A jury must determine whether Dr. Larson's decision to cease all further treatment following the fourth unsuccessful MRI was based on medical judgment.

**IT IS ORDERED** that the plaintiff's motion to appoint counsel for trial (Dkt. No. 49) is **GRANTED.** The Court will attempt to recruit counsel for trial.

Dated at Milwaukee, Wisconsin this 2nd day of February, 2021.

s/ *Brett H. Ludwig*<br>
Brett H. Ludwig<br>
United States District Judge